**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KIM NEUSS and ANTONIO NEUSS,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

RUBI ROSE, L.L.C., et al.,

        Defendants.

Civil Action No. 16-2339 (MAS) (LHG)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

    This matter comes before the Court on Defendants Rubi Rose, L.L.C., doing business as Dapple Baby, ("Dapple") and Ruby Ventures, Inc.'s ("Ruby Ventures") (collectively, "Defendants") motion to dismiss Plaintiffs Kim Neuss and Antonio Neuss's ("Plaintiffs") Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] (ECF No. 42.) Plaintiffs filed opposition and a cross-motion for leave to amend (ECF No. 45), and Defendants replied (ECF No. 46). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendants' motion to dismiss (ECF No. 42) is GRANTED with respect to Count V, which is dismissed without prejudice, and DENIED with respect to Counts I through IV and

---

[1] Defendants previously moved to dismiss Plaintiffs' Amended Complaint (ECF No. 17-1) and moved to strike the nationwide class allegations pursuant to Rule 23(d)(1)(D) of the Federal Rules of Civil Procedure (ECF No. 18-5). Plaintiffs filed opposition to both motions (ECF Nos. 22, 23) and requested leave to amend their Amended Complaint (ECF No. 23). In its May 31, 2017 Memorandum Opinion and Order, the Court granted in part and denied in part Defendants' motion to dismiss, denied Defendants' motion to strike, and granted Plaintiffs' cross-motion for leave to amend. (ECF Nos. 38, 39.)

Plaintiffs' request for punitive damages. Plaintiffs' cross-motion for leave to amend is DENIED without prejudice.

I. **Background**[2]

Plaintiffs filed this consumer fraud class action against Defendants, alleging that Defendants falsely represented on product labels, advertising, and websites that Dapple's specialty cleaning products "are natural, baby-safe, and free of SLS, SLES, parabens and/or formaldehyde when, in fact, they contain synthetic, highly processed and/or non-natural ingredient[s], are not baby safe,[3] and contain several ingredients that break down, contain, or produce SLS, SLES parabens, and/or formaldehyde." (Second Am. Compl. ¶ 1, 70, ECF No. 40.)

Ruby Ventures is an investment company with its principal place of business in New York, New York. (*Id.* ¶ 11.) Dapple is a limited liability company organized under the laws of the State of New York and a subsidiary of Ruby Ventures. (*Id.* ¶¶ 10, 11.) Dapple developed, manufactures, markets, and sells (both online and in retail stores) a line of "natural" household cleaners and personal care products (the "Products").[4] (*Id.* ¶¶ 26-27, 30.) Plaintiffs allege that: (i) Ruby

---

[2] For the purpose of this motion to dismiss, the Court accepts as true and summarizes the facts alleged in the Second Amended Complaint. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (stating that on a Rule 12(b)(6) motion to dismiss, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief" (internal citation omitted)).

[3] Throughout this Memorandum Opinion, the Court restates Plaintiffs' allegations and does not make any legal determinations of various terms' definitions (*e.g.*, "synthetic," "highly processed and/or non-natural," and "baby-safe.") (*See, e.g.*, Second Am. Compl. ¶¶ 1, 9, 28.)

[4] The Products are: (a) all-purpose cleaner spray; (b) all-purpose cleaner wipes; (c) dish liquid, fragrance-free; (d) dish liquid, lavender; (e) dishwasher pods, fragrance-free; (f) fragrance-free baby laundry detergent; (g) nursery cleaner spray; (h) pacifier wipes; (i) stain remover spray; (j) toy and high chair cleaner spray; (k) tub and tile cleaner spray; (l) baby laundry detergent pods; and (m) baby laundry booster pods. (*Id.* ¶ 29(a)-(m).)

Ventures was involved in the creation of Dapple's deceptive labeling and markets the Products on its website[5] (*id.* ¶¶ 19, 33); (ii) the Products' labels target consumers in the market for baby-safe cleaning products; and (iii) Dapple intends that consumers rely on labelling and website representations when making their purchasing decisions (*id.* ¶ 31). Each of the Products' labels states that it is "natural" or "naturally clean," without any qualification. (*Id.* ¶ 32.)

Both Dapple's and Ruby Ventures' websites market the Products as "natural." (*Id.* ¶ 33.) Plaintiffs allege, however, that Dapple's products do not contain only natural ingredients, as reflected in the explanatory parentheticals that appear next to many ingredients contained in Products' ingredient lists. (*Id.* ¶¶ 35-45 (describing parentheticals).) These ingredients are synthetic and highly processed substances. (*Id.* ¶¶ 52-59 (describing how ingredients are produced), 62.)

On or about August 2015, Plaintiffs were shopping on Amazon.com for a natural dish soap suitable for cleaning their baby's bottles and dishware when they saw a listing for Dapple's Refill Pack Baby Bottle and Dish Liquid, Fragrance-Free 34 fluid ounces (the "Refill Pack"). (*Id.* ¶ 70.) Plaintiffs read the label and representations on Defendants' websites (*id.*), and on or about August 17, 2015 and August 25, 2015, Plaintiffs purchased a Refill Pack from Amazon.com (*id.* ¶ 9). Based on the representations on the label and Defendants' websites, Plaintiffs understood that the Refill Pack was a "natural[] product[], baby-safe, made exclusively from plants, and/or free of SLS, SLES, parabens and/or formaldehyde" and that "natural products do not contain synthetic, highly processed and/or non-natural ingredients." (*Id.*) As a result, Plaintiffs purchased the Refill

---

[5] Additional facts regarding the relationship between Dapple and Ruby Ventures are described *infra* in Section III.A. of this Memorandum Opinion.

Pack on these two occasions for approximately $13.35 per unit (*id.* ¶ 70); however, had they known otherwise, Plaintiffs would not have made these purchases (*id.* ¶ 9).

Plaintiffs contend that reasonable consumers purchased the Products believing they were: (i) natural; however, consumers would not consider the Products to be natural if they knew ingredients were "synthetic, highly processed and/or non-natural" (*id.* ¶ 64); (ii) baby safe; however, consumers would not consider the Products to be baby safe if they knew the Products "contained toxicants and allergens that can lead to infant illnesses and death" (*id.* ¶ 65); and (iii) "free of SLS, SLES, parabens and formaldehyde[;]" however, consumers "would not deem the Products free of these substances if they knew that several ingredients . . . break down, contain, or produce SLS, SLES, parabens and/or formaldehyde" (*id.* ¶ 66). Accordingly, despite Plaintiffs' reasonable expectations, after using the Refill Pack, Plaintiffs determined that the Refill Pack "contained synthetic, unnatural ingredients that were not made from plants or baby safe, including, but not limited to, SLS, BIT and xanthan gum." (*Id.* ¶ 71.) Plaintiffs' ascertainable loss is either in the amount of the Refill Pack's purchase price or the premium Plaintiffs paid for the Refill Pack. (*Id.* ¶ 72.)

Plaintiffs' Second Amended Complaint sets forth five claims based on the Refill Pack's labels and Defendants' advertising and websites (*id.* ¶ 70)[6] on behalf of a proposed class of "[a]ll persons who purchased the [P]roducts within the United States," excluding Defendants' officers, directors and employees (*id.* ¶ 73): (1) violation of Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.* (Count One) (Second Am. Compl. ¶¶ 84-91); (2) violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1, *et seq.* (Count Two) (Second Am. Compl. ¶¶ 92-112); (3) breach of express warranty in violation of state warranty statutes from fifty

---

[6] Plaintiffs also assert claims based on twelve other Dapple products that they did not purchase.

4

states and the District of Columbia (Count Three) (*id.* ¶¶ 113-22); (4) breach of implied warranty (Count Four) (*id.* ¶¶ 123-33); and (5) common law fraud (Count Five) (*id.* ¶¶ 134-45).

## II. Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must "review[] the complaint to strike conclusory allegations[.]" *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678).

### III. Discussion

#### A. Whether Ruby Ventures is a Proper Party

Plaintiffs allege that Dapple is Ruby Ventures' agent and seek to hold Ruby Ventures vicariously liable for Dapple's conduct. (Second Am. Compl. ¶ 11.) Defendants, however, argue that Plaintiffs have failed to allege sufficient facts to state a claim for piercing the corporate veil. (Defs.' Moving Br. 7, ECF No. 42-1.)

"[T]o state a claim for piercing the corporate veil under New Jersey law, a plaintiff must show that: '(1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law.'" *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (citing *Craig v. Lake Asbestos of Quebec*, 843 F.2d 145, 149 (3d Cir. 1988)). Relevant factors in a court's inquiry include:

> gross undercapitalization . . . "failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."

*Foodtown, Inc.*, 296 F.3d at 172 (quoting *Craig*, 843 F.2d at 150). It is well-established that "mere ownership[, however,] of a subsidiary does not justify the imposition of liability on the parent." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *see also Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 508 (D.N.J. 2009).

Plaintiffs allege that Ruby Ventures controls "Dapple's management and day-to-day operations[,] just as it does for all of its so-called 'portfolio companies'" (Second Am. Compl. ¶ 13) and a "nepotistic managerial structure between Ruby Ventures' chairman and principals and the 'portfolio companies' . . . demonstrates a continuing failure to maintain . . . corporate

formalities" (*id.* ¶ 18). Specifically, Plaintiffs claim that: (i) various members of the Rubinstein family hold positions as officers or directors of both Ruby Ventures and certain of its subsidiaries; and (ii) Ruby Ventures and certain of its subsidiaries share the same places of business and office space. (*Id.* ¶¶ 13-18.) Plaintiffs further allege that Ruby Ventures helped create the labelling at issue in this case. (*Id.* ¶ 19.) Ilan Rubinstein, principal of Ruby Ventures and husband of Dapple's co-founder, Dana Rubinstein, purportedly manages both Ruby Ventures and Dapple and "was personally involved in changes made to the" labels at issue. (*Id.* ¶¶ 17, 21.) Finally, large national retailers sell Dapple's products, the Rubinstein family owns Ruby Ventures and is a partner in a prominent real estate development firm and yet, according to Plaintiffs, Mr. Rubinstein admitted that this lawsuit would "force him to close Dapple due to undercapitalization." (*Id.* ¶ 20.) Thus, Plaintiffs allege that Dapple funds are being hidden in Ruby Ventures. (*Id.*) Finally, Plaintiffs list various statements from Ruby Ventures' website that are allegedly misleading. (*Id.* ¶ 21.)

Here, the Court finds that Plaintiffs adequately allege that Ruby Ventures used Dapple as a "mere instrumentality." The Court acknowledges Defendants' assertions that: (i) the management structures of other Ruby Ventures subsidiaries are not directly relevant to the relationship between Ruby Ventures and Dapple; and (ii) Plaintiffs speculate that Dapple funds are hidden in Ruby Ventures. (Defs.' Moving Br. 7, 9.) A key fact in the Court's analysis, however, is that Plaintiffs allege that "Ilan Rubenstein stated that the present lawsuit would *force him to close Dapple* due to undercapitalization." (Second Am. Compl. ¶ 20) (emphasis added). This allegation, coupled with allegations that Mr. Rubenstein was involved in the creation of the labelling at issue, suggest that Mr. Rubenstein exerts a significant degree of control over Dapple's affairs, even though he seemingly held no position at the company. *Compare Foodtown, Inc.*, 296 F.3d at 172 (concluding that allegations were sufficient to meet the first prong of the veil-piercing

test where the complaint alleged that a corporation and its alleged alter ego: "failed to maintain formal barriers between the management structures"; "commingled funds and other assets"; "failed to observe other corporate formalities"; and "shared twelve of thirteen common directors"), *with Premier Pork LLC v. Westin, Inc.*, No. 07-1661, 2008 WL 724352, at *7 (D.N.J. Mar. 17, 2008) (finding that allegations that one corporation was a subsidiary of another, that both corporations shared the same chief financial officer, and that one corporation had a controlling interest in the other to be insufficient to pierce the corporate veil).

Further, the Court finds that Plaintiffs sufficiently pled that Ruby Ventures used Dapple "to perpetrate fraud, to accomplish injustice, or to circumvent the law" because Plaintiffs claim that Ruby Ventures and Ilan Rubenstein helped create the allegedly misleading labelling at issue and Ruby Ventures made deceptive representations about the Products on its website. *Foodtown, Inc.*, 296 F.3d at 172; (Second Am. Compl. ¶¶ 17, 19, 21).

**B.    Violation of the MMWA (Count One)**

Count One of the Second Amended Complaint alleges a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. (*Id.* ¶¶ 84-91.) The MMWA provides, in relevant part: "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply

with any obligation under this chapter, or under a written warranty,[7] implied warranty,[8] or service contract, may bring suit for damages and other legal and equitable relief[.]" 15 U.S.C. § 2310(d)(1). Claims under the MMWA "stand or fall with [the claimant's] express and implied warranty claims under state law." *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008); *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 254 (3d Cir. 2010) (affirming district court's dismissal of MMWA claim because it properly dismissed state law claims for breach of express and implied warranties); *Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 265 (D.N.J. 2011) ("A claim under the MMWA relies on the underlying state law claim."). Because Plaintiffs' state law claims for breach of express warranty and breach of the implied warranty of merchantability survive, as explained in Sections III.D. and E. below, Plaintiffs' accompanying MMWA claim survives as well.

C. **Violation of the NJCFA (Count Two)**

Count Two of the Second Amended Complaint alleges that Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq*. (Second Am. Compl. ¶¶ 92-112.) To state a claim under the NJCFA, a plaintiff must allege three elements: (1) the defendant's unlawful

---

[7] The MMWA defines "written warranty" as:

> any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time[,] which written affirmation, promise or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C. § 2301(6)(A).

[8] An "implied warranty" is defined as "an implied warranty arising under [s]tate law . . . in connection with the sale by a supplier of a consumer product." 15 U.S.C. § 2301(7).

conduct,[9] (2) the plaintiff's ascertainable loss, and (3) a causal relationship between the two. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007) (internal quotation marks omitted); *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007). There are three general categories of unlawful conduct: affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8-2, 56:8-4. *Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 648 (D.N.J. 2013) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994)). "[A]ffirmative acts must be misleading and stand outside the norm of reasonable business practice in that it will victimize the average consumer." *Harnish*, 931 F. Supp. at 648 (quoting *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 177 (N.J. Super. Ct. App. Div. 2003) (internal quotations omitted)). "An ascertainable loss under the NJCFA is one that is quantifiable or measurable, not hypothetical or illusory." *Annecharico v. Raymour & Flanigan*, No. 16-1652, 2016 WL 7015615, at *7 (D.N.J. Nov. 30, 2016) (internal quotation marks and citations omitted) (citing *D'Agostino v. Maldonado*, 78 A.3d 527, 537 (N.J. 2013)). "An ascertainable loss under the NJCFA occurs when a consumer receives less than what was promised." *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 335 (D.N.J. 2014) (quotations omitted) (citing *Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002)). The plaintiff must quantify "the difference in the value between the product received and

---

[9] The NJCFA defines "unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[.]

N.J.S.A. § 56:8-2. "Merchandise" is a broad term that includes "goods," "commodities," and "services of anything offered." N.J.S.A. § 56:8-(c). Here, the products in question are covered by the NJCFA.

the product promised." *Dzielak*, 26 F. Supp. 3d at 335 (quoting *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99-100 (D.N.J. 2011)). Finally, when bringing an NJCFA claim, plaintiffs must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Castro v. Sovran Self Storage, Inc.*, 114 F. Supp. 3d 204, 219 n.12 (D.N.J. 2015); Fed. R. Civ. P. 9(b). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200.

Defendants primarily argue[10] that Plaintiffs have essentially reiterated the same facts and information in their Second Amended Complaint as were contained in their previous filing. (Defs.' Moving Br. 20.) In response, Plaintiffs describe, in detail, what they contend are sufficient allegations fulfilling each element of an NJCFA claim. (Pls.' Opp'n Br. 15-25, ECF No. 44.)

Here, the Court finds that Plaintiffs sufficiently plead a NJCFA claim. As to the unlawful practice and its misleading nature, Plaintiffs allege that Defendants misrepresented on labelling that their products were "natural, baby-safe, made from plants and/or free of SLES, SLES Parabens & Formaldehyde" (Second Am. Compl. ¶ 28) and on the Dapple website that "[e]ach [D]apple

---

[10] Additionally, Defendants contend that all of Plaintiffs' claims based on purported misrepresentations fail as a matter of law because Defendants listed all product ingredients on the labels and website. (Defs.' Moving Br. 20-21.) Defendants assert that if Plaintiffs did not understand the meaning of the word "natural" in this context, the labels clarified any confusion by listing the products' ingredients. (*Id.* at 21.) Defendants also cite cases from federal courts in California for the proposition that "where a product's front label is accurate and consistent with the statement of ingredients, courts routinely hold that no reasonable consumer could be misled by the label, because a review of the statement of ingredients makes the composition . . . clear." (Defs.' Moving Br. 21); *Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 892 n.38 (C.D. Cal. 2013). The cited cases are not binding on this Court. Moreover, the Court finds the cases distinguishable because: (i) they deal with the labelling of food, not cleaning products; and (ii) the ingredient lists at issue in those cases do not include allegedly misleading parentheticals. Further, Defendants assert that the words "natural" and "baby-safe" cannot be misleading in this context because the term 'natural' does not have one established meaning. (Defs.' Moving Br. 22-25.) The Court declines to make this determination at the motion to dismiss stage.

product is created with naturally-based ingredients that are environmentally safe, biodegradable, and free of parabens, SLES, and phthalates, as well as synthetic dyes or fragrances" and "[m]ade with only non-toxic, plant-based ingredients" (*id.* ¶ 34). The Plaintiffs further allege that various substances listed as ingredients of Dapple products are accompanied by parenthetical explanations "intended to deceive purchasers into thinking that the listed ingredients are 'natural'" (*e.g.*, the parenthetical explanation following lauramine oxide reads "cleaner made from coconut oil"). (*Id.* ¶¶ 34-45.) Plaintiffs describe the processes by which certain ingredients are produced. (*Id.* ¶¶ 48-60; 99-102.) Additionally, some ingredients, according to Plaintiffs, are potentially allergens, toxicants and in one case, a substance associated with infant illness and mortality. (*Id.* ¶¶ 50-51, 54, 101.)

As to ascertainable loss, Plaintiffs allege that Dapple dish soap, for example, costs significantly more per ounce than competitors: "Dapple currently sells a 16.9-ounce bottle of Dish Liquid, Fragrance Free for $4.99 (approximately $0.30 per ounce) . . . [and] [c]onsumers can purchase a 24-ounce bottle of Up & Up™ Hand Wash Dish Soap, Unscented for $2.02 (approximately $0.08 per ounce) or a 25-ounce bottle of Seventh Generation™ Natural Dish Liquid, Free and Clear for $2.99 (approximately $0.12 per ounce)." (*Id.* ¶ 68.) Additionally, Plaintiffs allege that because of Defendants' representations about their products, "Plaintiffs purchased the [Refill Pack] from Amazon.com on two occasions, for approximately $13.35 per [Refill Pack]" and they paid "a premium over and above dish soaps that did not purport to be natural, baby safe, made from plants, and free of SLS, SLES, parabens and formaldehyde. . . ." (*Id.* ¶ 70.)

Finally, Plaintiffs have adequately alleged that Defendants' misrepresentations induced them to purchase the Refill Pack. Plaintiffs described the dates and circumstances of their

purchases and the representations they read, and stated that as a result of these representations, they purchased the Refill Pack. (*Id.* ¶¶ 70, 110.) Accordingly, these allegations adequately "inject precision" into the claim as required by Rule 9(b)'s heightened pleading standard and Plaintiffs' NJCFA claim survives Defendants' motion to dismiss. *See Solo v. Bed Bath & Beyond*, No. 06-1908, 2007 WL 1237825, at *4 (D.N.J. Apr. 26, 2007) (stating that "[a]dequate explanations [of causation] would include a statement by Plaintiff indicating that Plaintiff purchased" the product because of the representations on the product packaging); *In re Milo's Kitchen Dog Treats Consol. Cases*, 9 F. Supp. 3d 523, 534 (W.D. Pa. 2014) (assertions of reliance on the product's label and website during purchase "provide a sufficient basis to infer that Plaintiff purchased the jerky treats because of Defendants' alleged misrepresentations or, stated another way, would not have purchased the jerky treats absent Defendants' misrepresentations. Plaintiff therefore has satisfied the pleading requirements of Fed. R. Civ. P. 9(b). . . .")

### D. Breach of Express Warranty (Count Three)

Count Three of the Amended Complaint alleges a claim for breach of express warranty. (Second Am. Compl. ¶¶ 113-22.) To state a valid claim for breach of an express warranty under New Jersey law, a plaintiff must allege: "(1) that [the] [d]efendant made an affirmation, promise or description [of] the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (internal citations omitted); *see also In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 588 F. App'x 171, 175 (3d Cir. 2014). In addition, a plaintiff needs to allege proximate cause and damages. *Miller v. Samsung Elecs. Am., Inc.*, No. 14-4076, 2015 WL 3965608, at *14 (D.N.J. June 29, 2015) (citing *Marcus v. BMW of N. Am.*, 687 F.3d 583, 600 n.8 (3d Cir. 2012)).

"[W]hether a given statement constitutes an express warranty is normally a question of fact for the jury." *Dzielak*, 26 F. Supp. 3d at 324 (quoting *Snyder*, 792 F. Supp. 2d at 721-22); *see also Union Ink Co.*, 801 A.2d at 379 ("Whether the advertisements contained material misstatements of fact . . . presents a question to be determined by the trier of fact.").

Defendants contend that Plaintiffs essentially make the same allegations in their Second Amended Complaint. (Defs.' Moving Br. 14.) They assert that: (i) because all of the ingredients contained in the Products are listed on the Dapple website, Plaintiffs cannot claim that they believed the Refill Pack was "natural"; (ii) the Refill Pack's description is "not misleading or deceptive"; and (iii) damages were not reasonably foreseeable at the time Plaintiffs made their purchases. (*Id.* at 15.) In opposition, Plaintiffs allege that after reviewing the representations on the Refill Pack's labels and information on Defendants' websites, they purchased the Refill Pack based on their belief that the Product was "natural, baby safe, made from plants, and free of SLS, SLES, parabens and formaldehyde." (Second Am. Compl. ¶ 70.) Further, Plaintiffs allege that after purchase, they realized that the Refill Pack did not conform to Defendants' representations. (*Id.* ¶ 118.) Finally, Plaintiffs allege proximate cause and damages. (*See, e.g., id.* ("As a proximate cause of Defendants' breach of express warranty, Plaintiffs were induced to purchase a product that did not meet the marketing claims listed on the label and Defendants' websites . . . and . . . were damaged in the amount of the purchase price . . . .").)

The Court concludes that Plaintiffs sufficiently allege a claim for breach of an express warranty under New Jersey law. *See, e.g., Stewart v. Smart Balance, Inc.*, No. 11-6174, 2012 WL 4168584, at *13 (D.N.J. June 26, 2012) (holding that "[p]laintiffs state a claim for breach of express warranty because they sufficiently allege: (1) the [d]efendant makes a specific description that the product is 'fat free'; (2) the description was the basis of the bargain for the product; and

(3) the product ultimately did not conform to the description because it contained one gram of fat per serving.").

### E. Breach of Implied Warranty of Merchantability (Count Four)

Count Four of the Amended Complaint alleges a claim for breach of the implied warranty of merchantability. (Second Am. Compl. ¶¶ 123-33.) "Pursuant to the implied warranty of merchantability, a merchant warrants that goods sold are fit for the ordinary purposes for which the goods are used." *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2008 WL 4126264, at *19 (D.N.J. Sept. 3, 2008) (citing N.J.S.A. § 12A:2-314). Under New Jersey law, merchantable goods must "[be] fit for the ordinary purposes for which such goods are used; and . . . conform to the promises or affirmations of fact made on the container or label if any." N.J.S.A. § 12A:2-314(2)(c), (f).

Here, Plaintiffs claim that pursuant to N.J.S.A. § 12A:2-314(2)(c), "Defendants provided Plaintiffs and Class members with an implied warranty that the Products were fit for the ordinary purposes for which they were sold: *as cleaners safe to be used on children's dishes, bottles, clothes, pacifiers, and other items*." (Second Am. Compl. ¶ 124 (emphasis added)). Defendants argue that the Court previously found that Plaintiffs failed to allege facts that the Dapple products were not fit for their ordinary purpose of cleaning.[11] (Defs.' Moving Br. 11-12.) Thus, Plaintiffs

---

[11] Defendants also assert that other courts in the District of New Jersey have held that "failure to conform with promises or affirmations of fact on a product's label is insufficient to succeed on a claim for breach of the implied warranty of merchantability." (Defs.' Moving Br. 12 (citing *In re Gerber Probiotic Sales Practices Litig.*, No. 12-835, 2014 WL 1310038, at *13-14 (D.N.J. Mar. 31, 2014)). The Court finds *In re Gerber* distinguishable from the instant case because the *Gerber* plaintiffs "[did] not dispute that the general purpose of the products was to function as infant food" and "[did] not claim that the products were not fit for that purpose". *In re Gerber*, 2014 WL 1310038, at *14. Instead, they asserted that "false and misleading advertisements" that did not conform to the representations on the baby food container or label induced them to purchase the products. *Id.*

amended their complaint to make clear which subsection of the statute applies and that the alleged "ordinary purpose" of the Dapple products are as cleaners used to sanitize children's items. (Second Am. Compl. ¶ 124.) To that end, the Court concludes that the Amended Complaint sufficiently alleges that the claimed defects plausibly caused the Refill Pack to be at least unreliable for its purported "general purpose." Additionally, Plaintiffs claim a violation of N.J.S.A. § 12A:2-314(2)(f) because "the Products do not conform to the promises and affirmations of fact made on the Product labels." (*Id.* ¶ 126.) It is now clear from the Second Amended Complaint what representations Plaintiffs read on the Refill Pack's labels and reviewed on Dapple's website and that Plaintiffs claim that the Refill Pack "d[id] not conform to the promises or affirmations of fact made on the [Refill Pack's] label[s]." N.J.S.A. § 12A:2-314(2)(f). Accordingly, the Court finds that Plaintiffs have pled a claim for breach of implied warranty.

### F. Common Law Fraud (Count Five)

Count Five of the Second Amended Complaint is a claim for common law fraud. (Second Am. Compl. ¶¶ 134-45.) "Common law fraud involves a more onerous standard than a claim for fraud under the [NJ]CFA." *Mason v. Costco Wholesale Corp.*, No. 09-361, 2009 WL 2634871, at *7 (D.N.J. Aug. 26, 2009) (citing *Cox*, 647 A.2d at 459). "Under New Jersey law, the elements of common law fraud are: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Va. Sur. Co. v. Macedo*, No. 08-5586, 2011 WL 1769858, at *17 (D.N.J. May 6, 2011) (quoting *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005)). Fraud claims must be plead with particularity in accordance with Federal Rule of Civil Procedure 9(b). *Hemy v. Perdue Farms, Inc.*, No. 11-888, 2013 WL 1338199, at *9 (D.N.J. Mar. 13, 2013).

16

The Court need only address one element of the claim in this instance. In regard to Defendants' knowledge, Plaintiffs assert that based on three "widely available articles," Defendants knew or should have known that their alleged misstatements were false since 2011 or 2012. (Pls.' Opp'n Br. 26; Second Am. Compl. ¶ 138 n.45-47.) Plaintiffs' citations reveal that two articles were published in academic journals and one article was written by the European Scientific Committee on Consumer Safety. (Second Am. Compl. ¶ 138 n.45-47.) Plaintiffs fail to sufficiently allege facts that indicate Defendants were aware of the articles and facts that Defendants had knowledge or belief of their statements' falsity. Consequently, Plaintiffs fail to plead a claim for common law fraud under New Jersey law and the Court dismisses Count Five without prejudice.

**G.     Punitive Damages**

A plaintiff may only be awarded punitive damages if he or she "demonstrates that the defendant acted with the level of culpability required by the New Jersey Punitive Damages Act ("PDA"), N.J.S.A. § 2A:15-5.9, *et seq.*" *Gillman v. Rakouskas*, No. 16-4619, 2017 WL 379433, at *2 (D.N.J. Jan. 26, 2017) (citing *Vibra-Tech Eng'rs, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 499-500 (D.N.J. 2012)). The PDA requires a plaintiff to demonstrate

> by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

*Gilman*, 2017 WL 379433, at *2 (quoting N.J.S.A. § 2A:15-5.12(a)).

"Actual malice" in this analysis means "an intentional wrongdoing in the sense of an evil-minded act[,]" and "'[w]anton and willful disregard' means a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the

17

consequences of such act or omission." *Id.* At this early stage of the litigation and accepting all the facts alleged in the Second Amended Complaint as true, Defendants' motion to dismiss Plaintiffs' claim for punitive damages is denied without prejudice.

### H. Motion for Leave to Amend

The Court now turns to Plaintiffs' cross-motion for leave to amend their Second Amended Complaint. As noted in the Court's May 31, 2017 Memorandum Opinion, when filing a motion to amend, the plaintiff must attach a copy of the proposed amended complaint. *Fletcher-Harlee Corp. v. Pote Concrete Constr., Inc.*, 482 F.3d 247, 252 (3d Cir. 2007). Failing to do so is fatal for a motion to amend. *Id.* (citations omitted). A district court may deny the plaintiff an opportunity to amend his pleading "based on," among other things, "bad faith or dilatory motives, . . . repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993).

Here, Plaintiffs' cross-motion for leave to amend fails to comply with Local Civil Rule 7.1(f) for the second time, as it does not include a copy of the proposed amended complaint. Defendants argue that because Plaintiffs again violated Local Civil Rule 7.1(f), even after the Court noted Plaintiffs' failure to comply in its prior opinion, Plaintiffs' request should be denied. (Defs.' Reply Br. 10, ECF No. 46.) Moreover, Plaintiffs do not provide any allegations they would include in a further amended complaint. (*Id.*) The Court, therefore, denies Plaintiffs' cross-motion for leave to amend without prejudice.

## IV. Conclusion

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 42) is GRANTED with respect to Count V, which is dismissed without prejudice, and DENIED with respect to Counts I through IV and Plaintiffs' request for punitive damages. Plaintiffs' cross-motion for leave to amend is DENIED without prejudice. An Order consistent with this Memorandum Opinion will be entered.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Date: January 16th, 2018